**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| AHBP LLC, | § | |
| *Plaintiff* | § | |
| | § | SA-22-CV-00096-XR |
| -vs- | § | |
| | § | |
| THE LYND COMPANY,  BIO SUPPLIES | § | |
| LLC,  VIA CLEAN TECHNOLOGIES | § | |
| LLC, | § | |
| *Defendants* | § | |

<u>**ORDER ON MOTION TO DISMISS**</u>

On this date, the Court considered the motion to dismiss filed by Defendant Via Clean Technologies LLC (ECF No. 41) and Plaintiff's response (ECF No. 49). After careful consideration, the Court issues the following order.

**BACKGROUND**

In the summer of 2020, in the midst of the ongoing COVID-19 pandemic, Plaintiff AHBP, LLC ("AHBP") began negotiating with Defendants The Lynd Company ("Lynd") and Bio Supplies LLC ("Bio Supplies," and, together with Lynd "the Lynd Defendants") for the exclusive license to market and sell a surface disinfectant/cleaner known as "Bioprotect 500" (the "Product")—manufactured by Defendant Via Clean Technologies LLC ("ViaClean")—in Argentina. ECF No. 25 ¶ 1. Plaintiff alleges that Defendants made false representations about the quality of the Product, including that it was effective against the virus that causes COVID-19 and that it would meet the governmental standards for approval by Argentina's National Administration of Drugs, Foods and Medical Devices ("ANMAT"), as required to sell the Product in Argentina. *Id.* ¶ 2.

## I.      Formation of Bio Supplies and Publication of Press Release

Plaintiff alleges that, on May 5, 2020, the owners of the Lynd Company, Adam Lynd and Matthew Merritt, caused the incorporation of Bio Supplies, LLC on May 5, 2020, as "a shell company to insulate The Lynd Company from any and all liability arising from the Product." *Id.* ¶ 13. On May 21, 2020, approximately two weeks after Bio Supplies was formed, Lynd issued a press release for the Product (the "Press Release"), titled "LYND To Disinfect & Protect Apartments with BIOPROTECTUs System." *Id.* ¶ 14. In the Press Release, Lynd announced its own purported use of the Product, advertised the Product as effective against the coronavirus, and directed potential purchasers to purchase the Product "through www.biosupplies.com." *Id.* The Press Release did not disclose that Lynd and its owners also owned and controlled Bio Supplies. *Id.* Thus, Plaintiff contends that readers "would have been left with the impression that The Lynd Company was an uninvolved third-party that was so impressed with the Product, it issued its own press release." *Id.* "In reality," Plaintiff alleges, "the Press Release was deliberately designed to hide The Lynd Company's self-interest in increasing sales of the Product and dupe unsuspecting customers into purchasing the Product to increase The Lynd Company's revenue." *Id.*

## II.     Negotiations and Contract Between Plaintiff and the Lynd Defendants

In the summer of 2020, Plaintiff began negotiating with Bio Supplies, primarily through Matthew Merritt (an owner and officer of both Bio Supplies and The Lynd Company), to market and sell the Product, which Bio Supplies and ViaClean held out as a disinfectant manufactured by ViaClean that would effectively destroy the virus that causes COVID-19. *Id.* ¶ 15.

Plaintiff alleges that, during contract negotiations throughout August and September 2020, it advised Bio Supplies that it needed certain information about the Product's composition, manufacturing and quality controls, toxicology, and shelf life in order to obtain approval from

2

ANMAT (Argentina's version of the FDA) to sell the Product in Argentina. *Id.* ¶ 20. Bio Supplies responded that it could not provide the requested information because of confidentiality concerns. Plaintiff repeatedly advised that receipt of this information was vital to Plaintiff's decision to sign an agreement to purchase, sell, and market the Product. *Id.*

Plaintiff asserts that Bio Supplies—through Lynd Company employees David Lynd, Matthew Merritt, and Christopher Jett, each of whom used Lynd Company email addresses— repeatedly confirmed to AHBP over those two months that the Product would meet the applicable standards and promised to provide the relevant information once the parties signed a written contract. *Id.* ¶ 21. Despite these representations, Plaintiff alleges that Bio Supplies knew that the Product would not, and could not, perform as Defendants claimed and could not meet ANMAT's standards to allow the Product to be sold in Argentina. *Id.* ¶ 23. Indeed, according to Plaintiff, Bio Supplies at all times "intended to defraud Plaintiff by providing fraudulent, doctored laboratory reports that grossly and falsely exaggerated the efficacy of the Product." *Id.*

Unaware of this alleged scheme, Plaintiff relied on Bio Supplies' representations concerning the Product and its quality standards, "and with no way to verify them," Plaintiff entered into an Exclusivity and Resale Agreement with Bio Supplies, dated October 2020 (the "Agreement"). *Id.* ¶¶ 22, 24. Under the Agreement, Bio Supplies agreed to grant Plaintiff an exclusive license to sell the Product in Argentina. *Id.* ¶ 25. In return, the Agreement required Plaintiff to purchase no less than $100,000 worth of the Product from Bio Supplies within 45 days of execution of the Agreement and to spend no less than $350,000 to advertise and market the Product in Argentina, with additional, escalating Product purchase requirements thereafter. *Id.*

III.     **Defendants' Submission of Falsified Data to Plaintiff and ANMAT**

Plaintiff alleges that, after entering into the Agreement, Bio Supplies—through Lynd officers and employees, including Matthew Merritt—repeatedly promised to provide AHBP with information supporting its purported two-year shelf life and identifying the Product's composition, manufacturing and quality controls, and toxicology. *Id.* ¶ 26. Relying on these promises, and to fulfill its contractual obligations under the Agreement, Plaintiff began preparing its media campaign to market and sell the Product, including by hiring employees and designers, consulting with lawyers, accountants, biologists and virologists, renting warehouse and office space, and entering into contracts with buyers in Argentina. *Id.* ¶ 27.

Beginning on December 1, 2020, Bio Supplies, with the assistance of ViaClean's officer and general manager Joseph Raich, provided Plaintiff with some of the requested information, including several laboratory reports on the Product's efficacy and chemical composition. *Id.* ¶ 28. Finally, after repeated requests from Plaintiff, Bio Supplies and ViaClean sent a stability report (the "Report") on the Product performed by Cambridge Materials Testing ("Cambridge"), a Canadian laboratory, to ANMAT in support of Plaintiff's application to sell the Product in Argentina. *Id.* Defendants also sent a copy of the Report to Plaintiff. *Id.*

After reviewing the Report, ANMAT posed a number of questions to Plaintiff about the Product, including "why the Product's 'DMODA' content was part of the calculation of the Product's 'TPOA' content." *Id.* ¶ 29. Plaintiff alleges that it asked Bio Supplies for the information necessary to answer ANMAT's questions, but Bio Supplies failed to respond. *Id.* ¶ 30. To obtain answers, Plaintiff contacted Cambridge directly. *Id.* ¶ 31. Cambridge informed Plaintiff that the version of the Report that had been sent to Plaintiff and ANMAT was "not the same as what we had originally issued." *Id.* Cambridge observed that the product identification in the Report

4

submitted to ANMAT was different, and pointed out that "the TPOA values in the Table on page 3 have been altered . . . Please note, if you perform the equation with the numbers in the altered report, the TPOA will not yield the values shown in the Table on page 3." *Id.*

Plaintiff alleges that it immediately demanded answers from Bio Supplies and its agents regarding the altered Report that Bio Supplies and ViaClean provided to ANMAT on Plaintiff's behalf. *Id.* ¶ 32. Plaintiff alleges that Bio Supplies—through David Lynd and Matthew Merritt— and ViaClean—through Joseph Raich—initially denied altering the Report, claiming, among other things, that "the lab reports had not been altered by anyone." *Id.* ¶ 33.

Several weeks later, however, on March 5, 2021, Bio Supplies admitted that, along with ViaClean, it had in fact provided ANMAT with a version of the Report that had been "modified from the original." *Id.* ¶ 34. "In other words," Plaintiff asserts, "Defendants admitted that they fraudulently provided Argentina's version of the FDA with a falsified document on Plaintiff's behalf and in support of its application to sell the Product in Argentina." *Id.* ¶ 35.

Plaintiff alleges that this admission "severely underplayed their fraud." *Id.* ¶ 36. A comparison of the "modified" version of the Report with the original revealed that the product on which the Report was actually based was not the Product at all, but rather a different disinfectant containing 72% of the Product's active ingredient. *Id.* The Product contains a mere 5% of the same ingredient. *Id.* According to Plaintiff, "not only would a product containing a super concentrated amount of the active ingredient be expected to significantly outperform the Product, but it would also have a much longer shelf life than the diluted Product." *Id.* Thus, Plaintiff concludes that the Report sent to ANMAT on its behalf did not represent the properties of the Product, and parts of the Product information provided by Defendants were false and misleading. *Id.* ¶ 37.

5

In further support of its claim that Defendants misrepresented the quality and utility of the Product, Plaintiff notes that, on March 31, 2021, the United States Environmental Protection Agency ("EPA") issued a Stop Sale, Use or Removal Order ("Stop Order") to ViaClean ordering ViaClean to stop marketing the Product with claims that it was effective against public health-related pathogens, including the virus that causes COVID-19. *Id.* ¶ 38.

Plaintiff asserts that, as a result of Defendants' fraudulent scheme, it was unable to sell the Product in Argentina—the only place in the world that Plaintiff has a license to sell the Product. *Id.* ¶ 39. Plaintiff alleges that its buyers refused to continue doing business with Plaintiff because it could not fulfill its obligations to deliver the Product, its business reputation was severely diminished, and its pursuit of the media campaign was rendered a total loss. *Id.* Plaintiff alleges that Defendants have caused damages in the amount of no less than $90,426,300, including $89,600,000 in lost profits and $826,300 in out-of-pocket expenses. *Id.* ¶ 40.

## IV.   Procedural History

Plaintiff filed its initial Complaint against Lynd, Bio Supplies and ViaClean on February 3, 2022. ECF No. 1 ¶¶ 1–2. On February 18, 2022, AHBP filed its First Amended Complaint ("FAC"). ECF No. 15. Thereafter, all three Defendants filed motions to dismiss the FAC. ECF No. 22. Rather than filing oppositions to the motions, AHBP filed a Second Amended Complaint ("SAC"), the operative pleading. ECF No. 25. The SAC seeks over $90 million in damages and alleges claims against all three Defendants for fraud, negligent misrepresentation, violations of the Lanham Act, and business disparagement, and claims against the Lynd Defendants only for fraudulent inducement and breach of contract. *Id.* ¶¶ 41–83.

In November 2022, the Court dismissed Plaintiff's claim for business disparagement because the false information contained in the Report was not disparaging, but denied the motion

in all other respects. *See AHBP LLC v. Lynd Co.*, No. SA-22-CV-00096-XR, 2022 WL 17086368, at *1 (W.D. Tex. Nov. 18, 2022).

ViaClean now moves to dismiss Plaintiff's claims, arguing that allegations in the SAC do not satisfy the heightened pleading requirements under Rule 9(b) and that the claim for damages is implausible. *See* ECF No. 41.

## DISCUSSION

### I.      Legal Standard

Federal Rule of Civil Procedure 12(b)(6) allows a party to move for the dismissal of a complaint for "failure to state a claim upon which relief can be granted." To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A claim for relief must contain: (1) "a short and plain statement of the grounds for the court's jurisdiction"; (2) "a short and plain statement of the claim showing that the pleader is entitled to the relief"; and (3) "a demand for the relief sought." FED. R. CIV. P. 8(a). A plaintiff "must provide enough factual allegations to draw the reasonable inference that the elements exist." *Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Ga., Inc.*, 995 F. Supp. 2d 587, 602 (N.D. Tex. Feb. 3, 2014) (citing *Patrick v. Wal–Mart, Inc.-Store No. 155,* 681 F.3d 614, 617 (5th Cir. 2012)); *see also Torch Liquidating Trust ex rel. Bridge Assocs. L.L.C. v. Stockstill*, 561 F.3d 377, 384 (5th Cir. 2009) ("[T]he complaint must contain either direct allegations or permit properly drawn inferences to support every material point necessary to sustain recovery") (internal quotation marks and citations omitted).

"Claims alleging fraud and fraudulent inducement are subject to the requirements of Rule 9(b) of the Federal Rules of Civil Procedure." *Schnurr v. Preston*, No. 5:17–CV–512–DAE, 2018 WL 8584292, at *3 (W.D. Tex., May 29, 2018). Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). "[A]rticulating the elements of fraud with particularity requires a plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Williams v. VMX Technologies, Inc.*, 112 F.3d 175, 177 (5th Cir. 1997). "Directly put, the who, what, when, and where must be laid out." *Id.* at 178. "Facts and circumstances constituting charged fraud must be specifically demonstrated and cannot be presumed from vague allegations." *Howard v. Sun Oil Co.*, 404 F.2d 596, 601 (5th Cir. 1968). "Anything less fails to provide defendants with adequate notice of the nature and grounds of the claim." *Hart v. Bayer Corp.*, 199 F.3d 239, 247 n.6 (5th Cir. 2000). "Although the language of Rule 9(b) confines its requirements to claims of . . . fraud, the requirements of the rule apply to all cases where the gravamen of the claim is fraud even though the theory supporting the claim is not technically termed fraud." *Frith v. Guardian Life Ins. Co. of Am.*, 9 F. Supp. 2d 734, 742 (S.D. Tex. March 31, 1998).

In considering a motion to dismiss under Rule 12(b)(6), all factual allegations from the complaint should be taken as true, and the facts are to be construed in the light most favorable to the nonmoving party. *Fernandez-Montes v. Allied Pilots Assoc.*, 987 F.2d 278, 284 (5th Cir. 1993). Still, a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "'[N]aked assertions' devoid of 'further factual enhancement,'" and "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the presumption of truth.

*Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557); *see also R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (stating that the Court should neither "strain to find inferences favorable to plaintiffs" nor accept "conclusory allegations, unwarranted deductions, or legal conclusions.").

## II.    Analysis

### A.    Common Law Fraud (Count Two)

To prevail on a claim for common law fraud in Texas, a plaintiff must establish (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury. *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 212 (5th Cir. 2009).

Plaintiff alleges that in, December 2020, Via Clean, through its general manager, Joseph Raich, provided Plaintiff with numerous reports purporting to represent the Product's efficacy and chemical composition. ECF No. 25 ¶ 28. Plaintiff alleges that these reports contained false representations about the Product's TPOA values and active ingredient content. *Id.* ¶¶ 25, 31, 36–37). Plaintiff has established that this representation was material. Plaintiff repeatedly advised Bio Supplies during negotiations that it needed certain information about the Product's composition, manufacturing, and quality controls to obtain ANMAT approval. *See id.* ¶ 20. Plaintiff asserts that, despite these material representations, the Product did not meet ANMAT standards, and the laboratory results submitted to Plaintiff and ANMAT by Bio Supplies and Via Clean later proved

to be inaccurate. *Id.* ¶¶ 34–37.[1] Plaintiff alleges that ViaClean knew its representations in the Report about its own Product's composition were false. *Id.* ¶¶ 3, 34–35, 52. Via Clean intended to induce Plaintiff to act on those false representations, including by, among other things, applying to ANMAT for approval to sell the Product in Argentina. *Id.* ¶¶ 3, 34–35, 37, 53.

Together, these allegations establish the first four elements of a claim for common law fraud: ViaClean knowingly made false and material representations with the intent that Plaintiff should act them. Courts have recognized claims for fraud under similar circumstances. In *M-I, LLC v. Enventives, LLC*, for example, the magistrate judge found that the plaintiff had satisfied the pleading requirements of Rule 9(b) by alleging that "(1) all [d]efendants, through the acts of [specified employees] (who); (2) misrepresented to M-I the quality of chemicals M-I purchased from [d]efendants (what); (3) between April 6, 2016 and September 9, 2016 (when); (4) by performing laboratory tests on samples that were materially different than those shipped to M–I and providing M-I with falsified certificates of analysis for the defective product (where and how)." No. 4:17-CV-3275, 2018 WL 2376503, at *2 (S.D. Tex. Apr. 26, 2018), *report and recommendation adopted*, No. 4:17-CV-3275, 2018 WL 2371038 (S.D. Tex. May 24, 2018). Plaintiff has likewise identified the false representations (what) made by ViaClean (who) in the lab reports (where and how) in December 2020 (when). These allegations satisfy Rule 9(b)'s heightened requirements, *Williams*, 112 F.3d at 178; *Howard*, 404 F.2d at 601, and are certainly sufficient to "provide defendants with adequate notice of the nature and grounds of the claim." *Hart*, 199 F.3d at 247 n.6.

Accordingly, the Court concludes that Plaintiff has sufficiently alleged common law fraud. Nonetheless, ViaClean insists that it cannot be liable because its product with a higher (72-75%)

---

[1] Indeed, the EPA Stop Order further suggests that any representations as to the efficacy of the Product against the virus that causes COVID-19 were also false. ECF No. 25 ¶ 38.

concentration of the active ingredient is for "manufacturing use only," and the more diluted formula is actually safer for consumers. ECF No. 41 ¶¶ 47–53. The issue here is not whether the Product was "safe," however, but whether it had the efficacy and shelf life that ViaClean falsely represented in the Report. As Plaintiff points out, the Report describes an entirely different product than the Product that was the subject of Plaintiff's application to ANMAT. ECF No. 49 at 9. More importantly, ViaClean's argument plainly raises a question of fact that cannot be determined on a Rule 12(b)(6) motion to dismiss. *See, e.g.*, *Mugg v. Hutmacher*, No. 18-CV-732-RP, 2019 WL 3538979, at *6 (W.D. Tex. July 10, 2019) (denying motion to dismiss fraud claim because the "evidence [raised by defendants] may be relevant but resolving that factual dispute now would be premature on this record"), *adopted by* 2019 WL 3536049 (W.D. Tex. Aug. 2, 2019).

### B.    Negligent Misrepresentation (Count Three)

To state a claim for negligent misrepresentation, a plaintiff must show that "(1) the defendant made a representation in the course of its business or in a transaction in which it had an interest, (2) the defendant supplied false information for the guidance of others in their business, (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information, and (4) the plaintiff suffered pecuniary loss by justifiably relying on the representation." *Kersh v. UnitedHealthcare Ins. Co.*, 946 F. Supp. 2d 621, 638–39 (W.D. Tex. 2013) (quoting *Cunningham v. Tarski*, 365 S.W.3d 179, 186–87 (Tex. App.—Dallas 2012, pet. denied)). When claims for fraud and negligent misrepresentation arise from the same factual allegations, the pleading standard under Rule 9(b) applies to each claim. *See Lone Star Fund V (U.S.), LP v. Barclays Bank PLC*, 594 F.3d 383, 387 n.3 (5th Cir. 2010).

ViaClean's argument that Plaintiff's claim for negligent representation must be dismissed is premised on the insufficiency of AHBP's claims for common law fraud. *See* ECF No. 41 at 14.

11

Because the Court has concluded that the factual allegations in the SAC satisfy the pleading requirements of Rule 9(b), however, those allegations can readily support a claim for negligent misrepresentation.

### C.      Lanham Act § 43(a) (Count Four)

Section 43(a) of the Lanham Act provides a cause of action for "unfair competition through misleading advertising or labeling." *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 107 (2014) (citing 15 U.S.C. § 1125(a)). The Fifth Circuit has "interpreted this section of the Lanham Act as providing protection against a myriad of deceptive commercial practices, including false advertising or promotion." *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 495 (5th Cir. 2000) (citations and internal quotation marks omitted). A plaintiff may sue a competitor when that competitor's advertisements misrepresent the qualities or characteristics of its own goods or products or of the plaintiff's goods or products. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 137–38 (citing *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 800–01 (5th Cir. 2011)).

To state a claim under Section 43(a) of the Lanham Act, a plaintiff must allege: (1) a false or misleading statement of fact about a product; (2) that the statement actually deceived or has a tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the consumer's purchasing decision; (4) the product is in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result. *Eastman Chem. Co. v. Plastipure, Inc.*, 775 F.3d 230, 234 (5th Cir. 2014). On a motion to dismiss a Lanham Act claim, courts do not "require heightened pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Vill. Farms, L.P. v. Mastronardi Produce, Ltd.*, No. P-13-CV-57, 2014 WL 12492040, *2 (W.D. Tex. Feb. 25, 2014).

The Court acknowledges that ViaClean and AHBP may properly be considered competitors under the Lanham Act, given that both were—or intended to be—distributors in the market for sanitizing products. *See AHBP*, 2022 WL 17086368, at \*12–13 (citing *Societe Des Hotels Meridien v. LaSalle Hotel Operating P'ship, L.P.*, 380 F.3d 126, 132 (2d Cir. 2004) (denying Rule 12(b)(6) motion because "the text of the Lanham Act makes it clear that a false advertising claim can properly be brought against a defendant who misrepresents the quality of its own goods as well")). Nor does the Court doubt that the composition of a product may be material in that it is likely to influence consumers' purchasing decisions. Fundamentally, however, Plaintiff fails to allege that ViaClean made a false statement in the context of a commercial advertisement or promotion.

In order for representations to constitute "commercial advertising or promotion" under Section 43(a)(1)(B), they must be: (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services. *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1384 (5th Cir. 1996) (citing *Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics*, 859 F.Supp. 1521, 1534 (S.D.N.Y. 1997)). While the representations need not be made in a "classical advertising campaign," but may consist instead of more informal types of "promotion," the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry. *Id.* Long-standing precedent in this circuit holds that, in order to constitute "commercial advertising or promotion," the challenged communication must have been "disseminated sufficiently to the relevant purchasing public." *Boltex Mfg. Co., L.P. v. Galperti, Inc.*, 827 F. App'x 401, 406 n.2 (5th Cir. 2020) (citing *Seven-Up*, 86 F.3d at 1384).

Unlike the Lynd Press Release, ViaClean's only alleged false statements concerning the

Product were included in the Report distributed to Plaintiff and to ANMAT. *See* ECF No. 25 ¶¶ 34–37. The distribution of the Report to Plaintiff and to ANMAT was not itself intended to influence customers, nor was it sufficiently disseminated to the purchasing public to constitute "advertising" or "promotion" within that industry. *See Boltex*, 827 F. App'x at 406 n.2 (emails sent to two customers were not "commercial advertising or promotion" within the ambit of the Lanham Act). Thus, Plaintiff's claim against ViaClean for violation of Section 43(a) of the Lanham Act must be dismissed.

### D.     Business Disparagement (Count Five)

The tort of business disparagement "encompasses falsehoods concerning the condition or quality of a business's products or services that are intended to, and do in fact, cause financial harm." *Innovative Block of S. Tex., Ltd. v. Valley Builders Supply, Inc.*, 603 S.W.3d 409, 417 (Tex. 2020) (citing Restatement (Second) of Torts § 629 (1977)). To prevail on a business disparagement claim, a plaintiff must show that (1) the defendant published false and disparaging information about it, (2) with malice, (3) without privilege, and (4) that resulted in special damages to the plaintiff. *Forbes, Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex. 2003).

Plaintiff's business disparagement claim fails against ViaClean for the same reasons that it failed against the Lynd Defendants. *See AHBP*, 2022 WL 17086368, at *15–17. Insofar as it overstated the quality of the Product, the false information contained in the Report was not disparaging. While the reporting of false information may have caused Plaintiff to suffer reputational harm, reputational injury alone cannot support a claim for business disparagement. *Forbes*, 124 S.W.3d at 170. Accordingly, Plaintiff's claim against ViaClean for business disparagement must be dismissed.

14

### E.       Plausibility of Damages

ViaClean urges the Court to dismiss Plaintiff's claim for over $90 million in damages under Rule 12(b)(6)'s "judicial experience and common sense" plausibility requirement because AHBP, as a new business, will be unable to show lost profits. ECF No. 41 at 14. To the contrary, it is well settled that a plaintiff need not demonstrate in its pleading the precise amount of damages that it will recover at the end of a case after discovery and trial. *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 801–03 (5th Cir. 2011) (finding that simply pleading that the plaintiff lost business and profits due to the defendant's actions was sufficient in pleading damages). "At the motion-to-dismiss stage, a court's inquiry is limited to whether a complaint plausibly states a non-speculative claim for damages," *i.e.*, whether the damages are "measurable." *Rangel v. Adtalem Glob. Educ., Inc.*, No. SA-18-CV-00082-JKP, 2019 WL 6828298, at *7 (W.D. Tex. Dec. 13, 2019) (citing *FNC*, 634 F.3d at 802 n.41), *adopted by* 2020 WL 10056149, at *1 (W.D. Tex. Mar. 12, 2020); *Hong Kong Aroma Star Int'l LLC v. Elta MD, Inc.*, No. 3:18-CV-2228-G, 2020 WL 619898, *4 (N.D. Tex. Feb. 7, 2020) (denying motion to dismiss where it is plausible that the court "could find" plaintiff suffered damages).

Thus, as Plaintiff points out, ViaClean has raised an evidentiary issue rather than a pleading issue. *See* ECF No. 11 at 18. But even "[t]he absence of a history of profitability is not dispositive of the issue of recovery of lost profits; rather it is one consideration, and lost profits may be recovered, even absent a history of profitability, if other evidence establishes lost profits with reasonable certainty." *Hiller v. Mfrs. Prod. Rsch. Grp. of N. Am.*, 59 F.3d 1514, 1519 (5th Cir. 1995). Such evidence can include sales of advertising and license fees (*id.* at 1522), or "future contracts, from which lost profits can be calculated with reasonable certainty," *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 505 (Tex. 2001)). Here, it is plausible that Plaintiff suffered damages

as a result of the contracts it lost as a result of the Product's alleged inferior quality and is, at the very least, entitled to discovery on the issue. *Hiller*, 59 F.3d at 1521; *Cnty. of El Paso, Tex. v. Jones*, No. EP–09–CV–00119–KC, 2009 WL 4730345, at *12 (whether the "calculations . . . are ultimately correct is a matter best deferred until the fact-finding stages of the proceedings").

## CONCLUSION

For the foregoing reasons, Defendant Via Clean Technologies, LLC's motion to dismiss the Petition (ECF No. 41) is **GRANTED IN PART** with respect to Plaintiff's claims for business disparagement and for violation of Section 43(a) of the Lanham Act and **DENIED** in all other respects.

It is so **ORDERED**.

**SIGNED** this 9th day of January, 2023.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE