**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| AHBP LLC, | § | |
| *Plaintiff* | § | |
| | § | SA-22-CV-00096-XR |
| -vs- | § | |
| | § | |
| THE LYND COMPANY, BIO SUPPLIES | § | |
| LLC, VIA CLEAN TECHNOLOGIES | § | |
| LLC, | § | |
| *Defendants* | § | |

## <u>AMENDED ORDER ON MOTION TO DISMISS</u>

On this date, the Court considered the motion to dismiss filed by Defendants The Lynd Company and Bio Supplies LLC (ECF No. 27), Plaintiff's response (ECF No. 34), Defendants' reply (ECF No. 35), and the parties' arguments at the hearing held on June 14, 2022. After careful consideration, the Court issues the following amended order. amended order.[1]

## BACKGROUND

In the summer of 2020, in the midst of the ongoing COVID-19 pandemic, Plaintiff AHBP, LLC ("AHBP") began negotiating with Defendants The Lynd Company ("Lynd") and Bio Supplies LLC ("Bio Supplies," and, together with Lynd "the Lynd Defendants") for the exclusive license to market and sell a surface disinfectant/cleaner known as "Bioprotect 500" (the "Product") in Argentina. ECF No. 25 ¶ 1. Plaintiff alleges that the Lynd Defendants made false representations about the quality of the Product, including that it was effective against the virus that causes COVID-19 and that it would meet the governmental standards for approval by Argentina's National Administration of Drugs, Foods and Medical Devices ("ANMAT"), as required to sell the Product in Argentina. *Id.* ¶ 2.

---

[1]  The Court issues this amended order to correct certain clerical errors in the order originally issued on November 18, 2022. *See AHBP LLC v. Lynd Co.*, No. SA-22-CV-00096-XR, 2022 WL 17086368, at *1 (W.D. Tex. Nov. 18, 2022).

## I.      Formation of Bio Supplies and Publication of Press Release

Plaintiff alleges that, on May 5, 2020, the owners of the Lynd Company, Adam Lynd and Matthew Merritt, caused the incorporation of Bio Supplies, LLC on May 5, 2020, as "a shell company to insulate The Lynd Company from any and all liability arising from the Product." *Id.* ¶ 13. The Lynd Defendants have a substantial overlap in ownership, management, officers, and employees, including Adam Lynd and Matthew Merritt. *Id.* ¶ 9. Plaintiff alleges that this overlap also extends to day-to-day operations: the owners, directors, and employees of both entities use Lynd email addresses to conduct business purportedly on behalf of Bio Supplies; Bio Supplies uses Lynd's office to conduct business; and Lynd uses its own assets, resources, and finances to operate Bio Supplies while collecting its profits. *Id.* ¶¶ 9, 16–19.

On May 21, 2020, approximately two weeks after Bio Supplies was formed, Lynd issued a press release for the Product (the "Press Release"), titled "LYND To Disinfect & Protect Apartments with BIOPROTECTUs System." *Id.* ¶ 14. In the Press Release, Lynd announced its own purported use of the Product, advertised the Product as effective against the coronavirus, and directed potential purchasers to purchase the Product "through www.biosupplies.com." *Id.* The Press Release did not disclose that Lynd and its owners also owned and controlled Bio Supplies. *Id.* Thus, Plaintiff contends that readers "would have been left with the impression that The Lynd Company was an uninvolved third-party that was so impressed with the Product, it issued its own press release." *Id.* "In reality," Plaintiff alleges, "the Press Release was deliberately designed to hide The Lynd Company's self-interest in increasing sales of the Product and dupe unsuspecting customers into purchasing the Product to increase The Lynd Company's revenue." *Id.*

II.     **Negotiations and Contract Between Plaintiff and the Lynd Defendants**

As the COVID-19 pandemic ravaged Argentina in the summer of 2020, Plaintiff began negotiating with Bio Supplies, primarily through Matthew Merritt (an owner and officer of both Bio Supplies and The Lynd Company), to market and sell Bioprotect 500, which Bio Supplies and Via Clean held out as a disinfectant/cleaner manufactured by Via Clean that would effectively destroy the virus that causes COVID-19. *Id.* ¶ 15.

Plaintiff alleges that, during these negotiations, Bio Supplies, acting through officers and employees of The Lynd Company, held itself out to Plaintiff as being one with the Lynd Company. *Id.* ¶ 16. For example, all of Bio Supplies' email communications to Plaintiff were sent from email accounts of employees of The Lynd Company and contained The Lynd Company's information in the emails' signature blocks. *Id.* Moreover, David Lynd represented to Plaintiff during telephone calls in August and September 2020 that The Lynd Company intended to buy Via Clean, so that The Lynd Company would have full vertical control over the Product from manufacture—through Via Clean—to distribution and licensing—through Bio Supplies—implying that The Lynd Company already dominated and controlled Bio Supplies. David Lynd also allegedly advised Plaintiff through a Lynd email account, that "we" (*i.e.*, Lynd and Bio Supplies) distribute and sell the Product. *Id.* ¶ 18. In short, BioSupplies' statements and conduct, made by and through Lynd employees, allegedly "caused Plaintiff to believe that The Lynd Company stood behind Bio Supplies in terms of providing resources and operations for the distribution of the Product." *Id.* ¶ 19.

Plaintiff alleges that, during contract negotiations throughout August and September 2020, it advised Bio Supplies that it needed certain information about the Product's composition, manufacturing and quality controls, toxicology, and shelf life in order to obtain approval from

ANMAT (Argentina's version of the FDA) to sell the Product in Argentina. *Id.* ¶ 20. Bio Supplies responded that it could not provide the requested information due to confidentiality concerns. Plaintiff repeatedly advised that receipt of this information was vital to Plaintiff's decision to sign an agreement to purchase, sell, and market the Product. *Id.*

Plaintiff asserts that Bio Supplies—through Lynd Company employees David Lynd, Matthew Merritt, and Christopher Jett, each of whom used Lynd Company email addresses— repeatedly confirmed to AHBP over those two months that the Product would meet the applicable standards and promised to provide the relevant information once the parties signed a written contract. *Id.* ¶ 21. Despite these representations, Plaintiff alleges that Bio Supplies knew that the Product would not, and could not, perform as Defendants claimed and could not meet ANMAT's standards to allow the Product to be sold in Argentina. *Id.* ¶ 23. Indeed, according to Plaintiff, Bio Supplies at all times "intended to defraud Plaintiff by providing fraudulent, doctored laboratory reports that grossly and falsely exaggerated the efficacy of the Product." *Id.*

Unaware of this alleged scheme, Plaintiff relied on Bio Supplies' representations concerning the Product and its quality standards, "and with no way to verify them," Plaintiff entered into an Exclusivity and Resale Agreement with Bio Supplies, dated October 2020 (the "Agreement"). *Id.* ¶¶ 22, 24. Under the Agreement, Bio Supplies agreed to grant Plaintiff an exclusive license to sell the Product in Argentina. *Id.* ¶ 25. In return, the Agreement required Plaintiff to purchase no less than $100,000 worth of the Product from Bio Supplies within 45 days of execution of the Agreement and to spend no less than $350,000 to advertise and market the Product in Argentina, with additional, escalating Product purchase requirements thereafter. *Id.*

### III.     Defendants' Submission of Falsified Data to Plaintiff and ANMAT

Plaintiff alleges that, after entering into the Agreement, Bio Supplies—through Lynd officers and employees, including Matthew Merritt—repeatedly promised to provide AHBP with information supporting its purported two-year shelf life and identifying the Product's composition, manufacturing and quality controls, and toxicology. *Id.* ¶ 26. Relying on these promises, and to fulfill its contractual obligations under the Agreement, Plaintiff began preparing its media campaign to market and sell the Product, including by hiring employees and designers, consulting with lawyers, accountants, biologists, and virologists, renting warehouse and office space, and entering into contracts with buyers in Argentina. *Id.* ¶ 27.

Beginning on December 1, 2020, Bio Supplies, with the assistance of Via Clean, through its officer and general manager Joseph Raich, provided Plaintiff with some of the requested information, including several laboratory reports on the Product's efficacy and chemical composition. *Id.* ¶ 28. Finally, after repeated requests from Plaintiff, Bio Supplies and Via Clean sent a stability report (the "Report") on the Product performed by Cambridge Materials Testing ("Cambridge"), a Canadian laboratory, to ANMAT in support of Plaintiff's application to sell the Product in Argentina. *Id.* Defendants also sent a copy of the Report to Plaintiff. *Id.*

After reviewing the Report, ANMAT posed a number of questions to Plaintiff about the Product, including "why the Product's 'DMODA' content was part of the calculation of the Product's 'TPOA' content." *Id.* ¶ 29. Plaintiff alleges that it asked BioSupplies for the information necessary to answer ANMAT's questions, but Bio Supplies failed to respond. *Id.* ¶ 30. To obtain answers, Plaintiff contacted Cambridge directly. *Id.* ¶ 31. Cambridge informed Plaintiff that the version of the Report that had been sent to Plaintiff and ANMAT was "not the same as what we had originally issued." *Id.* Cambridge observed that the product identification in the Report

submitted to ANMAT was different, and pointed out that "the TPOA values in the Table on page 3 have been altered . . . Please note, if you perform the equation with the numbers in the altered report, the TPOA will not yield the values shown in the Table on page 3." *Id.*

Plaintiff alleges that it immediately demanded answers from Bio Supplies and its agents regarding the altered Report that Bio Supplies and Via Clean provided to ANMAT on Plaintiff's behalf. *Id.* ¶ 32. Plaintiff alleges that Bio Supplies—through David Lynd and Matthew Merritt—and Via Clean—through Joseph Raich—initially denied altering the Report, claiming, among other things, that "the lab reports had not been altered by anyone." *Id.* ¶ 33.

Several weeks later, however, on March 5, 2021, Bio Supplies admitted that, along with Via Clean, it had in fact provided ANMAT with a version of the Report that had been "modified from the original." *Id.* ¶ 34. "In other words," Plaintiff asserts, "Defendants admitted that they fraudulently provided Argentina's version of the FDA with a falsified document on Plaintiff's behalf and in support of its application to sell the Product in Argentina." *Id.* ¶ 35.

Plaintiff alleges that this admission "severely underplayed their fraud." *Id.* ¶ 36. A comparison of the "modified" version of the Report with the original revealed that the product on which the Report was actually based was not the Product at all, but rather a different disinfectant containing 72% of the Product's active ingredient. *Id.* The Product contains a mere 5% of the same ingredient. *Id.* According to Plaintiff, "not only would a product containing a super concentrated amount of the active ingredient be expected to significantly outperform the Product, but it would also have a much longer shelf life than the diluted Product." *Id.* Thus, Plaintiff concludes that the Report sent to ANMAT on its behalf did not represent the properties of the Product, and parts of the Product information provided by Defendants were false and misleading. *Id.* ¶ 37.

In further support of its claim that the Lynd Defendants misrepresented the quality and utility of the Product, Plaintiff notes that, on March 31, 2021, the United States Environmental Protection Agency ("EPA") issued a Stop Sale, Use or Removal Order ("Stop Order") to Via Clean ordering Via Clean to stop marketing the Product with claims that it was effective against public health-related pathogens, including the virus that causes COVID-19. *Id.* ¶ 38.

Plaintiff asserts that, as a result of Defendants' fraudulent scheme, it was unable to sell the Product in Argentina—the only place in the world that Plaintiff has a license to sell the Product. *Id.* ¶ 39. Plaintiff's buyers refused to continue doing business with Plaintiff because Plaintiff could not fulfill its obligations to deliver the Product, its business reputation was severely diminished, and its pursuit of the media campaign was rendered a total loss. *Id.* Plaintiff alleges that Defendants have caused damages in the amount of no less than $90,426,300, including $89,600,000 in lost profits and $826,300 in out-of-pocket expenses. *Id.* ¶ 40.

## IV.   Procedural History

Plaintiff filed its initial Complaint against Lynd, Bio Supplies and Via Clean on February 3, 2022. ECF No. 1 ¶¶ 1–2. On February 18, 2022, AHBP filed its First Amended Complaint ("FAC"). ECF No. 15. Thereafter, all three Defendants filed motions to dismiss the FAC. ECF No. 22. On April 5, 2022, Rather than filing oppositions to the motions, AHBP filed a Second Amended Complaint ("SAC"), the operative pleading. ECF No. 25.

The SAC asserts six causes of action against Lynd, Bio Supplies, and ViaClean, alleging claims for (1) fraudulent inducement; (2) fraud; (3) negligent misrepresentation; (4) violations of the Lanham Act; (5) business disparagement; and (6) breach of contract, and seeking over $90 million in damages. *Id.* ¶¶ 41–83.

Defendants Lynd and Bio Supplies (collectively, the "Lynd Defendants") now move to dismiss all of Plaintiff's claims, on several bases. ECF No. 27. First, Defendants argue that all claims against Lynd must be dismissed because the SAC fails to sufficiently allege that Lynd is the alter ego of Bio Supplies, which is the only basis for AHBP's causes of action against Lynd. *Id.* at 13–19. Next, the Lynd Defendants argue that Plaintiff's claims sounding in fraud fail to satisfy the heightened pleading standard under Rule 9(b). *Id.* at 21–26. With respect to Plaintiff's claim for violations of Section 43(a) of the Lanham Act, the Lynd Defendants contend that, not only does the SAC fail to sufficiently allege a claim for such a violation, but that Plaintiff lacks standing to raise such a claim in the first place. *Id.* at 26–31. The SAC also fails to state a claim for breach of contract, they argue, because AHBP fails to identify any specific provision of the Agreement that Bio Supplies purportedly breached. *Id.* at 36–37. Finally, the Lynd Defendants submit that the Agreement itself limits Plaintiff's claims in two ways. First, they argue  that Plaintiff's tort claims are barred by the economic loss doctrine. *Id.* at 33–36. Second, to the extent Plaintiff's claim for breach of contract survives, they assert that the portions of the SAC seeking damages in excess of $100,000.00 must be dismissed pursuant to the limitations of liability provision in the Agreement. *Id.* at 38–39. The Court will address each argument in turn.

## DISCUSSION

### I.    Legal Standard

Federal Rule of Civil Procedure 12(b)(6) allows a party to move for the dismissal of a complaint for "failure to state a claim upon which relief can be granted." To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A claim for relief must contain: (1) "a short and plain statement of the grounds for the court's jurisdiction"; (2) "a short and plain statement of the claim showing that the pleader is entitled to the relief"; and (3) "a demand for the relief sought." Fed. R. Civ. P. 8(a). A plaintiff "must provide enough factual allegations to draw the reasonable inference that the elements exist." *Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Ga., Inc.*, 995 F. Supp. 2d 587, 602 (N.D. Tex. Feb. 3, 2014) (citing *Patrick v. Wal–Mart, Inc.-Store No. 155,* 681 F.3d 614, 617 (5th Cir. 2012)); *see also Torch Liquidating Trust ex rel. Bridge Assocs. L.L.C. v. Stockstill*, 561 F.3d 377, 384 (5th Cir. 2009) ("[T]he complaint must contain either direct allegations or permit properly drawn inferences to support every material point necessary to sustain recovery") (internal quotation marks and citations omitted).

"Claims alleging fraud and fraudulent inducement are subject to the requirements of Rule 9(b) of the Federal Rules of Civil Procedure." *Schnurr v. Preston*, No. 5:17–CV–512–DAE, 2018 WL 8584292, at *3 (W.D. Tex., May 29, 2018). Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "[A]rticulating the elements of fraud with particularity requires a plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Williams v. VMX Technologies, Inc.*, 112 F.3d 175, 177 (5th Cir. 1997). "Directly put, the who, what, when, and where must be laid out." *Id.* at 178. "Facts and circumstances constituting charged fraud must be specifically demonstrated and cannot be presumed from vague allegations." *Howard v. Sun Oil Co.*, 404 F.2d 596, 601 (5th Cir. 1968). "Anything less fails to provide defendants with adequate notice of the nature and grounds of the claim." *Hart v. Bayer Corp.*, 199 F.3d 239, 247 n.6 (5th

Cir. 2000). "Although the language of Rule 9(b) confines its requirements to claims of . . . fraud, the requirements of the rule apply to all cases where the gravamen of the claim is fraud even though the theory supporting the claim is not technically termed fraud." *Frith v. Guardian Life Ins. Co. of Am.*, 9 F. Supp. 2d 734, 742 (S.D. Tex. March 31, 1998).

In considering a motion to dismiss under Rule 12(b)(6), all factual allegations from the complaint should be taken as true, and the facts are to be construed in the light most favorable to the nonmoving party. *Fernandez-Montes v. Allied Pilots Assoc.*, 987 F.2d 278, 284 (5th Cir. 1993). Still, a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "'[N]aked assertions' devoid of 'further factual enhancement,'" and "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the presumption of truth. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557); *see also R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (stating that the Court should neither "strain to find inferences favorable to plaintiffs" nor accept "conclusory allegations, unwarranted deductions, or legal conclusions.").

## II.     Analysis

### A.     Veil-Piercing Claims Against Lynd

Defendants argue that the claims against Lynd premised on Bio Supplies' conduct must be dismissed because the factual allegations in the SAC are insufficient to justify disregarding the corporate form. ECF No. 27 at 13–19.

"Under Texas's choice-of-law rules, whether a corporation, LLC, or individual may be held liable pursuant to a veil-piercing theory is determined by the law of the state in which the entity is organized." *Ogbonna v. USPLabs, LLC*, No. EP–13–CV–347–KC, 2014 WL 2592097, at

*5 (W.D. Tex. June 10, 2014). As Lynd was formed in Texas, Texas law will determine whether Lynd can be held responsible for the alleged acts of Bio Supplies. ECF No. 25 ¶ 7. Under Texas law, claims to disregard the corporate statutes fall into three categories: "(1) the corporation is the alter ego of its owners and/or shareholders; (2) the corporation is used for illegal purposes; and (3) the corporation is used as a sham to perpetrate a fraud." *W. Horizontal Drilling, Inc. v. Jonnet Energy Corp.*, 11 F.3d 65, 67 (5th Cir. 1994); *see also Castleberry v. Branscum*, 721 S.W.2d 270, 272 & nn. 2–3 (Tex. 1986) (listing the grounds for veil-piercing). Whether a plaintiff may pierce an entity's veil pursuant to either the alter ego theory or the sham to perpetrate a fraud theory depends on whether the plaintiff's claims sound in tort or contract. *Ogbonna,* 2014 WL 2592097, at *8. Whereas a tort claimant may freely pierce the veil under either of these theories, a contract claimant may only pierce the veil if the defendant has also committed an actual fraud against the plaintiff for the defendant's direct personal benefit. *Id.* That is, the contract claimant must show that the "holder, beneficial owner, subscriber, or affiliate caused the corporation to be used for the purpose of perpetrating and did perpetrate an *actual fraud* on the obligee primarily for the direct personal benefit of the holder, beneficial owner, subscriber, or affiliate." TEX. BUS. ORGS. CODE § 21.223(b).

In Texas, "[a]lter ego comes into play where a corporation is organized and operated as a mere tool or business conduit of another corporation." *Adams Offshore Ltd. v. OSA Int'l, LLC*, No. H–09–0465, 2011 WL 4625371, at *9 (S.D. Tex. Sept. 30, 2011). "Parties are not [] jointly liable for a corporation's obligations 'merely because they were part of a single business enterprise,' i.e., 'merely because of centralized control, mutual purposes, and shared finances.'" *Robinson*, 390 S.W.3d at 508. "Rather, '[d]isregarding the corporate structure involves two considerations': (1)

"the relationship between [the] two entities" and (2) "whether the entities' use of limited liability was illegitimate." *Id.*

Plaintiff has adequately alleged that Bio Supplies was organized and operated as a mere tool or business conduit of Lynd. Plaintiff alleges that Lynd's owners created Bio Supplies mere weeks before negotiating with Plaintiff as a shell entity to knowingly sell a defective product and insulate Lynd from liability, while the revenue from selling the Product "would go directly to The Lynd Company." ECF No. 25 ¶¶ 13–14. Plaintiff further asserts that Bio Supplies communicated with Plaintiff through Lynd officers/employees David Lynd, Matthew Merritt, and Christopher Jett, using Lynd email accounts with Lynd signature blocks, suggesting that Bio Supplies and Lynd were one in the same. *Id.* ¶16. Moreover, during telephone calls in August and September 2020, David Lynd allegedly represented to Plaintiff that The Lynd Company intended to buy ViaClean so that Lynd would have "full vertical control" over the manufacture and distribution of the Product, creating an inference that Lynd also controlled Bio Supplies. *Id.* ¶ 17. As detailed above, the Lynd Defendants have a substantial overlap in ownership, officers and management, and Bio Supplies operates from Lynd's office space. *Id.* ¶ 9. These facts are sufficient to establish that Lynd and Bio Supplies were part of a single business enterprise. *Adams Offshore*, 2011 WL 4625371, at *9 (denying motion to dismiss where plaintiffs alleged that two entities were controlled by the same officers). Accordingly, the Court will turn to Plaintiff's allegations of "actual fraud." TEX. BUS. ORGS. CODE § 21.223(b) (permitting disregard of corporate fiction when actual fraud was done "primarily for the direct personal benefit" of the corporate owner or affiliate).

"'Actual fraud' is defined as 'involv[ing] dishonesty of purpose or intent to deceive.'" *See Spring St. Partners–IV, L.P. v. Lam*, 730 F.3d 427, 442 (5th Cir. 2013). (quoting *Tryco Enters., Inc. v. Robinson*, 390 S.W.3d 497, 508 (Tex. App.—Houston [1st Dist.] 2012, writ dism'd)).

Importantly, "in the context of piercing the corporate veil, actual fraud is not equivalent to the tort of fraud." *Latham v. Burgher*, 320 S.W.3d 602, 607 (Tex. App.—Dallas 2010, no pet.). Indeed, "the requirements for showing actual fraud are *less burdensome* than those for establishing fraud." *Weston Grp., Inc. v. Sw. Home Health Care, LP*, No. 3:12-CV-1964-G, 2014 WL 940329, at *2 (N.D. Tex. Mar. 11, 2014) (emphasis added).

"Since actual fraud requires showing 'dishonesty of purpose or intent to deceive,'" *see Archer v. Griffith*, 390 S.W.2d 735, 740 (Tex. 1964), establishing actual fraud is controlled by 9(b)'s guideline that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged *generally*." FED. R. CIV. P. 9(b) (emphasis added). In practice, Courts may deduce fraudulent intent from all of the facts and circumstances of a given case. *See Matter of Chastant*, 873 F.2d 89, 91 (5th Cir. 1989); *Weston Grp.*, 2014 WL 940329, at *2 ("[C]ourts generally look at the totality of a shareholder's actions to determine whether he committed actual fraud."); *see, e.g.*, *Spring St. Partners*, 730 F.3d at 445 (finding actual fraud where the defendant created an LLC to shift assets and allowed the company's charter to lapse after litigation began); *In re Arnette*, 454 B.R. 663, 694–95 (Bankr. N.D. Tex. 2011) (holding that a party committed actual fraud by making material misrepresentations, failing to disclose important information, and never intending to comply with the terms of the parties' agreement); *Latham*, 320 S.W.3d at 610 ("A rational juror could also have decided Latham's conduct in dissolving the corporation in the face of Burgher's claim represented dishonesty of purpose or an intent to deceive, *i.e.*, actual fraud.").

Without ever defining the term, the Lynd Defendants appear to view the "actual fraud" showing not as an independent evidentiary requirement for piercing the corporate veil but as an additional element to be superimposed onto a claim for common-law fraud. ECF No. 27 at 14–16 (suggesting that Plaintiff has failed to allege "actual fraud" because the allegations of fraud in the

SAC do not satisfy Rule 9(b)'s heightened pleading requirements). In other words, the Lynd Defendants interpret "actual fraud" as a *more* demanding showing than "fraud." There are multiple reasons to doubt the Lynd Defendants' reading of the veil-piercing requirements.

First, the Lynd Defendant's focus on common-law fraud is misplaced because the appropriate counterpart to "actual fraud" is not "fraud" but "*constructive* fraud." *See Archer*, 390 S.W.2d at 740. "Actual fraud" involves "dishonesty of purpose or intent to deceive, whereas constructive fraud is the breach of some legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests." *Id.*

Second, as a practical matter, Rule 9(b)'s heightened pleading requirements is at odds with the totality-of-the-circumstances approach courts have taken in assessing "actual fraud"—a plaintiff would be required to lay out the "the who, what, when, and where" with respect to each "circumstance" bearing on the defendant's state of mind. *Weston Grp.*, 2014 WL 940329, at *2; *Williams*, 112 F.3d at 177. Even then, it is very unlikely that the actions showing an individual's "intent to deceive" would independently support a claim for common-law fraud. Indeed, much of the relevant conduct would amount to routine business matters—forming and dissolving entities, transferring funds and ownership interests, executing contracts, sending invoices, marketing products—that, absent "dishonesty of purpose or intent to deceive," would not amount to wrongdoing at all. *See Spring St. Partners*, 730 F.3d at 445 (creation of LLC was evidence of actual fraud); *Latham*, 320 S.W.3d at 610 (dissolution of corporation was sufficient to establish actual fraud). The very purpose of the intent inquiry is to determine whether the defendant used otherwise legitimate corporate structures and procedures to achieve dishonest ends.

Finally, the Lynd Defendants' proposed interpretation of actual fraud would seem to obviate the need for veil-piercing under most circumstances. That is, if every contract claimant seeking to pierce the corporate veil must come armed with an independently actionable claim for fraud against the targeted shareholder, why bother with veil-piercing in the first place? After all, the fraud claim would open the door to punitive damages unavailable in a purely contractual dispute. *Tex. Nat'l Bank v. Karnes*, 717 S.W.2d 901, 903 (Tex. 1986) ("Punitive damages are not recoverable for breach of contract. The party seeking punitive damages must obtain at least one finding of an independent tort with accompanying actual damages.") (citations omitted).

In short, the Court is unpersuaded by the Lynd Defendants' characterization of the "actual fraud" showing required to disregard the corporate form in breach-of-contract cases. All that is required at the pleading stage is a general allegation of Lynd's dishonest purpose or deceitful intent with respect to Bio Supplies and its transactions. *See Archer*, 390 S.W.2d at 740; FED. R. CIV. P. 9(b). Here, Plaintiff easily meets that standard. Plaintiff asserts that Lynd owners created Bio Supplies as a shell company for the sole purpose of selling a "sham Product," simultaneously allowing Lynd to collect all of the revenue from Product sale and insulating Lynd from any liability. ECF No. 25 ¶¶ 13–14. Plaintiff further alleges that Lynd abused the corporate form by suggesting in some circumstances—*e.g.*, the Press Release announcing Lynd's use of the Product—that the entities were unrelated third parties and in others—*e.g.*, in negotiations with Plaintiff—that Lynd and Bio Supplies were a single enterprise. *Id.* ¶¶ 14, 16–19. Finally, Plaintiff asserts that Lynd intended to deceive Plaintiff as to the quality of the Product—both its ability to meet ANMAT standards and its ability to destroy the virus that causes COVID-19. *See id.* ¶¶ 23, 38.

In sum, the Court concludes that Plaintiff has sufficiently alleged that Bio Supplies is Lynd's alter ego. *Weston Grp.*, 2014 WL 940329, at *2 (misrepresentations by defendants regarding contractual obligations sufficient to allege alter ego liability because fraud allegations that "go beyond a mere 'conclusory description' of wrongdoing" are such that a "jury could infer actual fraud" and should not be dismissed). While the Lynd Defendants appear to dispute many allegations offered in support of Plaintiff's claims for alter ego liability, those factual disputes must be resolved at the summary judgment stage or at trial.

### B.      Fraudulent Inducement and Common Law Fraud (Counts One and Two)

Under Texas law, there are two types of common-law fraud: (1) simple fraud, also known as fraudulent misrepresentation, and (2) fraudulent inducement, which is when someone allegedly induces another to enter into a contract by using false representations." *Bates Energy Oil & Gas v. Complete Oilfield Servs.*, 361 F. Supp. 3d 633, 660 (W.D. Tex. 2019). Although fraudulent misrepresentation and fraudulent inducement are separate causes of action, both have the same elements. *Id.* These elements are (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury. *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 212 (5th Cir. 2009). To show fraud based on a promise of future performance, a plaintiff must also show that the person making the promise had no intention of performing at the time he made the promise. *Fluorine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 858 (5th Cir. 2004); *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998).

As a preliminary matter, the Lynd Defendants' sprawling attack on Plaintiff's fraud claims appears to rest on the assumption that plaintiffs must reiterate every relevant factual allegation under each cause of action to which it applies. This assumption is not supported by either law or common sense. *Martinez v. Nueces Cnty., Tex.*, No. 2:13-CV-178, 2013 WL 6190519, at *3 (S.D. Tex. Nov. 26, 2013) ("To require Plaintiffs to recount the specific facts upon which each claim rests when stating that claim would require Plaintiffs to repeat the two pages of facts with respect to each claim. Such repetition would render the pleading unwieldy and would detract from, rather than add to, its clarity."). It is true that referring to the defendants collectively, "without distinguishing which entity or persons committed the various alleged fraudulent conduct," is generally insufficient. *Hidden Values, Inc.*, No. 3:11–CV–1917–L, 2012 WL 1836087, at *4 (N.D. Tex. May 18, 2012). Still, "[m]ultiple defendants' conduct may be 'lumped together' " without violating Rule 9(b) "if the plaintiff's allegations elsewhere designate the nature of the defendant's relationship to a particular scheme and identify the defendants' role" in the alleged fraud. *Ogbonna*, 2014 WL 2592097, at *10. *See also Hellas Constr., Inc. v. Premier Polymers, LLC*, No. A-07-CV-759-JN, 2008 WL 11383486, at *2 (W.D. Tex. Jan. 10, 2008) ("Defendants argue that Plaintiff fails to distinguish which people were acting on behalf of which Defendant, Premier Polymers or Crystal Products, as is required under Rule 9(b). However, Plaintiff explicitly pleads that *all three* were representatives, and employees or officers of 'both Premier and Crystal.'" (citations omitted). As discussed below, the facts in the SAC are alleged with sufficient particularity to support Plaintiff's claims for common-law fraud.

Plaintiff identifies two false and material representations by Bio Supplies. First, Plaintiff alleges that in August and September 2020, Bio Supplies repeatedly represented over email, through Lynd employees David Lynd, Matthew Merritt, and Christopher Jett, that the Product

would meet ANMAT standards. ECF No. 25 ¶ 21. Second, Plaintiff alleges that, on December 1, 2020, Bio Supplies and Via Clean, through general manager, Joseph Raich, provided Plaintiff with numerous reports purporting to represent the Product's efficacy and chemical composition. *See id.* ¶ 28. Plaintiff has established that both representations were material. Plaintiff repeatedly advised Bio Supplies during negotiations that it needed certain information about the Product's composition, manufacturing, and quality controls to obtain ANMAT approval and that receipt of this information was vital to Plaintiff's decision to enter into the Agreement. *See id.* ¶ 20. Plaintiff asserts that, despite these material representations, the Product did not meet ANMAT standards, and the laboratory results submitted to Plaintiff and ANMAT by Bio Supplies and Via Clean later proved to be inaccurate. *Id.* ¶¶ 34–37.[2] Plaintiff alleges that Bio Supplies knew that the Product could not satisfy ANMAT standards during contract negotiations, but falsely represented that it would in order to induce Plaintiff to enter into and perform under the Agreement and proceed with the ANMAT approval process based on the falsified information in the Report. *See id.* ¶¶ 21–23, 33–34.

Together, these allegations establish the first four elements of a claim for common law fraud: the Lynd Defendants knowingly made false and material representations with the intent that Plaintiff should act them. Courts have recognized claims for fraud under similar circumstances. In *M-I, LLC v. Enventives, LLC*, for example, the magistrate judge found that the plaintiff had satisfied the pleading requirements of Rule 9(b) by alleging that "(1) all [d]efendants, through the acts of [specified employees] (who); (2) misrepresented to M-I the quality of chemicals M-I purchased from [d]efendants (what); (3) between April 6, 2016 and September 9, 2016 (when); (4) by performing laboratory tests on samples that were materially different than those shipped to M–

---

[2] Indeed, the EPA Stop Order further suggests that any representations as to the efficacy of the Product against the virus that causes COVID-19 were also false. ECF No. 25 ¶ 38.

I and providing M-I with falsified certificates of analysis for the defective product (where and how)." No. 4:17-CV-3275, 2018 WL 2376503, at *2 (S.D. Tex. Apr. 26, 2018), *report and recommendation adopted*, No. 4:17-CV-3275, 2018 WL 2371038 (S.D. Tex. May 24, 2018). Plaintiff has likewise identified the false representations (what) made by Bio Supplies through specific Lynd employees and Via Clean partners (who) in emails and lab reports (where and how) in August, September, and December 2020 (when). These allegations satisfy Rule 9(b)'s heightened requirements, *Williams*, 112 F.3d at 178; *Howard*, 404 F.2d at 601, and are certainly sufficient to "provide defendants with adequate notice of the nature and grounds of the claim." *Hart*, 199 F.3d at 247 n.6.

As to the two remaining elements, the SAC established that Plaintiff both relied on the Lynd Defendants' representations about the quality of the Product and has suffered injuries as a result. Plaintiff continued to rely on these false representations as it began to perform its obligations under the Agreement by "preparing its media campaign to market and sell the Product, including by hiring employees and designers, consulting with lawyers, accountants, biologists and virologists, renting warehouse and office space, and entering into contracts with buyers in Argentina." *Id.* ¶ 27. Plaintiff further relied on the false misrepresentations contained in the Report when it ordered Bio Supplies to submit a copy of the Report to ANMAT in support of Plaintiff's application for approval of the Product. *Id.* ¶¶ 28, 54. As a result, Plaintiff further alleges that its buyers refused to continue doing business with AHBP, that its business reputation was severely diminished, and that its pursuit of the media campaign was rendered a total loss. *Id.* ¶ 39.

For the foregoing reasons, the Court concludes that Plaintiff has sufficiently alleged claims for common-law fraud and fraudulent inducement.

### C.     Negligent Misrepresentation (Count Three)

To state a claim for negligent misrepresentation, a plaintiff must show that "(1) the defendant made a representation in the course of its business or in a transaction in which it had an interest, (2) the defendant supplied false information for the guidance of others in their business, (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information, and (4) the plaintiff suffered pecuniary loss by justifiably relying on the representation." *Kersh v. UnitedHealthcare Ins. Co.*, 946 F. Supp. 2d 621, 638–39 (W.D. Tex. 2013) (quoting *Cunningham v. Tarski*, 365 S.W.3d 179, 186–87 (Tex. App.—Dallas 2012, pet. denied)). When claims for fraud and negligent misrepresentation arise from the same factual allegations, the pleading standard under Rule 9(b) applies to each claim. *See Lone Star Fund V (U.S.), LP v. Barclays Bank PLC*, 594 F.3d 383, 387 n.3 (5th Cir. 2010).

The Lynd Defendants' argument that Plaintiff's claim for negligent representation must be dismissed is premised on the insufficiency of AHBP's claims for common-law fraud and fraudulent inducement. Because the Court has concluded that the factual allegations in the SAC satisfy the pleading requirements of Rule 9(b), however, those allegations can readily support a claim for negligent misrepresentation. Nonetheless, the Lynd Defendants submit that the SAC fails to allege that Plaintiff reasonably relied on any misstatements made before the Agreement was formed. ECF No. 27 at 26. Specifically, they argue that, given Bio Supplies' failure to produce the requested verification that the Product would comply with ANMAT standards and Plaintiff's inability to independently confirm this information, "AHBP provided no explanation for why it continued forward with the Agreement, absent the requested information." *Id.*

Justifiable reliance usually presents a question of fact for the jury to decide. *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 497 (Tex. 2019). Given that the Lynd

Defendants refused to provide the information before Plaintiff entered into the Agreement "due to confidentiality concerns," it is unclear how Plaintiff could have discovered the suboptimal quality of the Product through due diligence. It was reasonable for Plaintiff to rely on the representations of Lynd employees that the Product would meet the applicable standards and that the relevant information would be provided once the parties signed a written contract. The reliance was especially reasonable considering the Lynd Defendants' representations that they distributed the Product to many different large companies and governmental agencies, which are themselves presumably subject to regulatory standards such as those set by ANMAT. At the very least, whether Plaintiff justifiably relied on the Lynd Defendants' representations is a question of fact that cannot be decided on a pre-answer motion to dismiss. *Barrow-Shaver Res. Co.*, 590 S.W.3d at 497. Viewing the SAC in the light most favorable to Plaintiff, the Court concludes that the factual allegations are sufficient to support Plaintiff's claim for negligent misrepresentation.

### D.     Lanham Act § 43(a) (Count Four)

Section 43(a) of the Lanham Act provides a cause of action for "unfair competition through misleading advertising or labeling." *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 107 (2014) (citing 15 U.S.C. § 1125(a)). The Fifth Circuit has "interpreted this section of the Lanham Act as providing protection against a myriad of deceptive commercial practices, including false advertising or promotion." *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 495 (5th Cir. 2000) (citations and internal quotation marks omitted). A plaintiff may sue a competitor when that competitor's advertisements misrepresent the qualities or characteristics of its own goods or products or of the plaintiff's goods or products. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 137–38 (citing *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 800–01 (5th Cir. 2011)).

     *1.    Statutory Standing*

By its text, the Lanham Act "authorizes suit by 'any person who believes that he or she is likely to be damaged' by a defendant's false advertising." *Lexmark*, 572 U.S. at 129 (quoting 15 U.S.C. § 1125(a)(1)). It provides a civil cause of action against any person who, in connection with goods or services, uses any "false or misleading description of fact, or false or misleading representation of fact. . . ." 15 U.S.C. § 1125(a)(1). The Supreme Court, however, has concluded that not everyone with Article III standing can bring a false advertising claim under the Lanham Act. *Lexmark*, 572 U.S. at 129. In *Lexmark*, the Court set forth a two-part test for determining whether a plaintiff can sue under the Lanham Act: (1) the "zone-of-interest test" and (2) the "proximate cause requirement." *Id.* at 134.

Relying on the text of the Lanham Act, the Supreme Court concluded that "to come within the zone of interests in a suit for false advertising under § 1125(a), a plaintiff must allege an injury to a commercial interest in reputation or sales." *Id.* at 132. Consumers or businesses that are misled into purchasing an inferior product are generally not considered within the zone of interest. *Id.* "Even a business misled by a supplier into purchasing an inferior product is, like consumers generally, not under the Act's aegis." *Id.*

The "proximate-cause requirement" for statutory standing "generally bars suits for alleged harm that is 'too remote' from the defendant's unlawful conduct." *Lexmark*, 572 U.S. at 133. To satisfy this requirement, "a plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id.* at 134. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [the Court] presume[s] that general

allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (citation and internal quotation marks omitted).

Plaintiff's alleged injuries—"lost profits and loss of goodwill"—are injuries to precisely the sorts of commercial interests the Act protects. AHBP is suing not as a deceived consumer, but as a "perso[n] engaged in" "commerce within the control of Congress," whose position in the marketplace has been damaged by the Lynd Defendants' false advertising as to the quality of their product. 15 U.S.C. § 1127. Nonetheless, drawing on several cases arising out of the Third Circuit interpreting a single sentence in *Lexmark*, the Lynd Defendants insist that Plaintiff's injuries cannot fall within the Lanham Act's zone of interest because "courts have consistently held that a business does not have standing to bring a Section 43(a) claim against its supplier, even where the business alleges to have been misled by its supplier into purchasing a mislabeled product." ECF No. 27 at 27 (citing, *inter alia*, *The Knit With v. Knitting Fever, Inc.*, 625 F. App'x 27, 41 (3d Cir. 2015); *see also MHA, LLC v. Siemens Healthcare Diagnostics, Inc.*, No. 15-1573 (JLL), 2017 WL 838797, at *2–3 (D.N.J. Mar. 2, 2017) (quoting *POM Wonderful*, 573 U.S. at 107 ("[plaintiff] is not protected by the Lanham Act in this instance, because even though 'in the end consumers also benefit from the [Lanham] Act's proper enforcement, the cause of action is for competitors, not consumers.").

In *The Knit With*, the Third Circuit concluded that a yarn retailer who was misled by its supplier into purchasing mislabeled yarn was not within the zone of interests protected by the Lanham Act. 625 F. App'x at 41. In reaching this conclusion, the Third Circuit relied on the following language from the Supreme Court's decision in *Lexmark*:

> [T]o come within the zone of interests in a suit for false advertising under § 1125(a), a plaintiff must allege an injury to a commercial interest in reputation or sales. A consumer who is hoodwinked into purchasing a disappointing product may well have an injury-in-fact cognizable under Article III, but he cannot invoke the

protection of the Lanham Act—a conclusion reached by every Circuit to consider the question. **Even a business misled by a supplier into purchasing an inferior product is, like consumers generally, not under the Act's aegis.**

572 U.S. at 132 (citations omitted) (emphasis added).

The Court is neither bound nor persuaded by this apparently categorical rule that a business entity can never assert a claim for false advertising under the Lanham Act against one of its suppliers. Such a rule disregards the economic realities of modern supply chains in favor of a shallow and artificially narrow understanding of the distinction between consumers and competitors. In this Court's view, whether an entity's claims fall within the ambit of the Lanham Act does not depend on its place in the supply chain but on the manner in which its interests have allegedly been harmed. This understanding is consistent with the practical approach that courts take in assessing allegedly anticompetitive conduct in other contexts. In antitrust cases, for example, injuries to competition are generally identified by reference to the relevant market, which must reflect the realities of competition. *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 466–67 ("Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law[.]"); *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965) ("Without a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition.").

This understanding is also consistent with the Supreme Court's characterization of the scope of the Lanham Act in *Lexmark*. There, the Court acknowledged that the "classic Lanham Act false-advertising claim" is one in which a competitor induces customers to purchase its products instead of those of the plaintiff by making false statements about its own goods or the competitor's goods." *Lexmark*, 572 U.S. at 137 (quoting *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 799 n.24 (5th Cir. 2011) ("The paradigmatic case in which the directness of

the plaintiff's asserted injury most clearly supports standing is one in which the defendant's 'literally false advertising about its own goods influenced its customers to buy its products instead of [the plaintiff]'s product.'")). The Court recognized that "a plaintiff who does not compete with the defendant will often have a harder time establishing proximate causation," but it declined to adopt a rule prohibiting all suits under the Lanham Act by noncompetitors because doing so "would read too much into the Act's reference to 'unfair competition.'" *Id.* at 136 ("It is thus a mistake to infer that because the Lanham Act treats false advertising as a form of unfair competition, it can protect only the false-advertiser's direct competitors."). The Court held that:

> a plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff. **That showing is generally not made when the deception produces injuries to a fellow commercial actor that in turn affect the plaintiff.** For example, while a competitor who is forced out of business by a defendant's false advertising generally will be able to sue for its losses, the same is not true of the competitor's landlord, its electric company, and other commercial parties who suffer merely as a result of the competitor's 'inability to meet [its] financial obligations.

*Id.* at 133–34 (emphasis added) (citing *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458 (2006)); *see id.* at 136 ("It is thus a mistake to infer that because the Lanham Act treats false advertising as a form of unfair competition, it can protect only the false-advertiser's direct competitors.").

The distinction between "consumers generally" and the entities protected under the Lanham Act is clearer in context. Here, a hypothetical proposed in *Lexmark* is instructive:

> Consider two rival carmakers who purchase airbags for their cars from different third-party manufacturers. If the first carmaker, hoping to divert sales from the second, falsely proclaims that the airbags used by the second carmaker are defective, both the second carmaker **and its airbag supplier** may suffer reputational injury, and their sales may decline as a result. In those circumstances, there is no reason to regard either party's injury as derivative of the other's; each is directly and independently harmed by the attack on its merchandise.

*Id.* at 138–39 (emphasis added). It would not appear, on the other hand, that a restaurant could

recover under the Lanham Act for harm to its commercial interests arising out of its purchase of an inferior sanitizer based on false advertising about its quality and efficacy. Even assuming that business slowed down after several instances of food poisoning, the restaurant's injuries—in the form of lost profits and reputational harm—would not fall within the scope of the Lanham Act because it was harmed, like any other consumer, by its *use* of the product. Conversely, a co-distributor of the sanitizer that suffered losses as a result of the supplier's overstatements of the product's quality would suffer lost profits and reputational harm as a *distributor* rather than as a *consumer*.

Here, both Plaintiff and Bio Supplies were distributors in the market for sanitizing products. Indeed, the SAC explicitly alleges that "Plaintiff and Bio Supplies each act as distributors of the Product, and, thus, are competitors." ECF No. 25 ¶ 68. Despite the parties' respective positions in the supply chain, the Court concludes that, as a competitor of Bio Supplies, Plaintiff falls squarely within the Lanham Act's "zone of interests." Even if Plaintiff and Bio Supplies were not competitors, Plaintiff would have standing under the Lanham Act because it lost sales as a result of the Lynd Defendants' false advertising of the Product. *See Educ. Impact, Inc. v. Danielson*, No. 14–937 (FLW)(LHG), 2015 WL 381332, at *14 (D.N.J. Jan. 28, 2015) ("although DGLLC is not in direct competition with EI, the claims made on its website, if shown to be false, likely have the effect of limiting EI's sales"); *see also Societe Des Hotels Meridien v. LaSalle Hotel Operating P'ship, L.P.*, 380 F.3d 126, 132 (2d Cir. 2004) (denying Rule 12(b)(6) motion, "the text of the Lanham Act makes it clear that a false advertising claim can properly be brought against a defendant who misrepresents the quality of its own goods as well"); *Twentieth Century Fox Film Corp. v. Marvel Enters.*, 277 F.3d 253, 259–60 (2d Cir. 2002) ("The licensor's sole enjoyment of the goodwill in the licensed mark does not entitle it to make false claims to promote

its own product, allegedly to the detriment of its licensee, and we see no reason why a false advertising claim may not be brought by a licensee just because the alleged violator is the licensor.") (citations omitted).

Plaintiff has likewise satisfied the "proximate-cause requirement" for statutory standing under the Lanham Act. Plaintiff has alleged that it has suffered both economic and reputational injury flowing directly from the Lynd Defendants' deceptive advertising as to the quality of the Product. *Lexmark*, 572 U.S. at 133. Plaintiff was allegedly unable to sell the Product as a result of the Lynd Defendants' false advertising as to its efficacy.

Plaintiff has established that its false advertising claim falls within the Lanham Act's zone of interest and has satisfied the proximate-cause requirement set forth in *Lexmark*. Accordingly, the Court concludes that Plaintiff has statutory standing to assert a cause of action under the Lanham Act.

### 2.     *Sufficiency of Plaintiff's Section 43(a) Claim*

To state a claim under Section 43(a) of the Lanham Act, a plaintiff must allege: (1) a false or misleading statement of fact about a product; (2) that the statement actually deceived or has a tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the consumer's purchasing decision; (4) the product is in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result. *Eastman Chem. Co. v. Plastipure, Inc.*, 775 F.3d 230, 234 (5th Cir. 2014). On a motion to dismiss a Lanham Act claim, courts do not "require heightened pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Vill. Farms, L.P. v. Mastronardi Produce, Ltd.*, 2014 WL 12492040, *2 (W.D. Tex. Feb. 25, 2014).

The allegations in the SAC are sufficient to support a claim under Section 43(a) of the Lanham Act. First, Plaintiff alleges throughout the SAC that the Lynd Defendants made false representations concerning the quality of the Product that it licensed to Plaintiff for sale in the Press Release. Specifically, the Press Release mispresented the Product's ability to destroy the virus that causes COVID-19 and to meet ANMAT's standards. *See* ECF No. 25 ¶ 23. Second, Plaintiff alleges that it was actually deceived by the Lynd Defendant's false representations. *Id.* ¶ 24. Third, Plaintiff has sufficiently alleged that the deception as to the quality of the product is material in that it is likely to influence consumers' purchasing decisions. Indeed, the EPA Stop Order issued in connection with the same suggests that the false statements about its effectiveness against public-health related pathogens were likely to influence consumers. *Id.* ¶ 38. The parties do not appear to dispute that the Product is in interstate commerce. Finally, Plaintiff has sufficiently alleged that it has been injured as a result of the Lynd Defendants' false representations—buyers have refused to continue doing business with AHBP; its business reputation was severely diminished; and it has suffered monetary losses arising out of its failed media campaign. *Id.* ¶ 39.

The Lynd Defendants object that Plaintiff's claim must fail because (1) Plaintiff has not alleged that any information contained in the Press Release was false ("i.e. that Lynd used the Product or that the Product was effective in combatting coronavirus"); and (2) Bio Supplies cannot be held liable for any misrepresentations contained in the Press Release because it did not issue the Press Release.[3] ECF No. 27 at 30–31. The Court disagrees on both counts.

---

[3] The Lynd Defendants also appear to suggest, without any explanation, that the Press Release was not an "advertisement" within the meaning of the Lanham Act. *See* ECF No. 27 at 30 (citing *Gordon & Breach Sci. Pubs. S.A. v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1535 (S.D.N.Y. 1994) ("While the representations need not be made in a 'classic advertising campaign,' but may consist instead of more informal types of 'promotion,' the representations . . . must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry."). The Court disagrees. The Press Release constitutes the kind of commercial promotion governed by the Lanham Act.

First, the Court can reasonably infer from the EPA Stop Order that the Product was not effective against the virus that causes COVID-19. The Lynd Defendants emphasize that Plaintiff's losses allegedly arise out of their inability to sell the Product in Argentina and note that the Press Release makes no reference to Argentina or ANMAT compliance. *Id.* at 32–33. But Plaintiff's claim under the Lanham Act is distinct from its claims for fraud and misrepresentation. The Press Release was misleading as a general matter insofar as it suggested that the Product was effective and that Lynd was using the Product as a disinterested consumer.

Second, Plaintiff has clearly alleged a false advertising claim against Lynd individually, *see* ECF No. 25 at 13, and, given the Court's conclusion that Bio Supplies is Lynd's alter ego, the Court need not parse out any liability stemming from the Press Release at this stage of the proceedings. Indeed, Plaintiffs allege that the Press Release was attributed to Lynd to deliberately conceal its relationship with Bio Supplies. *Id.* ¶ 14.

Accordingly, the Court concludes that Plaintiff has adequately alleged a violation of Section 43(a) of the Lanham Act, and the Lynd Defendants' motion is denied.

### E.    Business Disparagement (Count Five)

The tort of business disparagement "encompasses falsehoods concerning the condition or quality of a business's products or services that are intended to, and do in fact, cause financial harm." *Innovative Block of S. Tex., Ltd. v. Valley Builders Supply, Inc.*, 603 S.W.3d 409, 417 (Tex. 2020) (citing Restatement (Second) of Torts § 629 (1977)). To prevail on a business disparagement claim, a plaintiff must show that (1) the defendant published false and disparaging information about it, (2) with malice, (3) without privilege, and (4) that resulted in special damages to the plaintiff. *Forbes, Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex. 2003).

Plaintiff alleges that Defendants published false and disparaging information about Plaintiff by providing ANMAT with the falsified Report on Plaintiff's behalf. ECF No. 25 ¶ 73. It is undisputed that the information provided in the Report was false. The parties disagree, however, on whether the false information was disparaging. The Lynd Defendants argue that submitting the falsified Report to ANMAT did not disparage Plaintiff because it provided false information about the Product rather than about AHBP and because the false information itself—the inflated percentage of the active ingredient—was not itself disparaging of either the Product or AHBP. *See* ECF No. 27 at 32; ECF No. 35 at 27. Plaintiff responds that the Lynd Defendants' submission of the falsified Report "created the false impression" that Plaintiff was misrepresenting the contents of the Product to ANMAT and Plaintiff's prospective customers. ECF No. 34 at 32.

The Lynd Defendants correctly note that false or inaccurate information alone is not enough to sustain a cause of action for business disparagement—the statement must be both false and critical of the plaintiff. *Fluor Enters., Inc. v. Conex Int'l Corp.,* 273 S.W.3d 426, 434 (Tex. App.—Beaumont 2008, pet. denied). Although the Report itself concerned the quality of the Product, Plaintiff alleges that the Report was submitted on AHBP's behalf in support of the application for ANMAT approval. Construing the allegation that the Report was submitted "on Plaintiff's behalf" in light most favorable to AHBP, the Court is satisfied that the SAC establishes a sufficient nexus between the Report and AHBP to reasonably infer that statements about the Product in the Report would reflect on AHBP. ECF No. 25 ¶ 35; *see also id.* ¶ 29 (alleging that ANMAT directed its questions about the discrepancies in the Report "to Plaintiff" rather than to Bio Supplies or Via Clean).

Nonetheless, the Court cannot conclude that the false information contained in the Report was disparaging. The Restatement provides that "a statement is disparaging if it is understood to

cast doubt upon the quality of another's . . . chattels . . . and (a) the publisher intends the statement to cast the doubt, or (b) the recipient's understanding of it as casting doubt was reasonable." Restatement (Second) of Torts § 629 (1977). Generally, to be liable for a claim for business disparagement, the defendant must "intend the statement to be understood in a disparaging sense, or the statement though not so intended must be such that a reasonable man would so understand it." *Id.*

Plaintiff argues that statements that create "false impressions" about a product can create an actionable claim for business disparagement. ECF No. 34 at 32 (citing *Kinect Solar, LLC v. Panasonic Corp. of N. Am.*, No. 1:20-CV-378-LY, 2020 WL 6385292, at *4 (W.D. Tex. Oct. 30, 2020). In *Kinect Solar*, the defendant manufacturer, Panasonic Corporation of North America ("Panasonic"), entered into a partnership with Tesla, Inc. to manufacture a line of solar panels known as "SolarCity" solar panels. The plaintiff, Kinect Solar, later purchased SolarCity panels from Tesla in a liquidation sale, and began selling them at a discounted price. At the same time, Panasonic was also selling SolarCity panels directly through its own distribution network, at a higher rate. In a letter to its customers, Panasonic indicated, truthfully, that the SolarCity panels manufactured for Tesla "were not covered by warranties issued by Panasonic Life Solutions Company of America." *Id.* at *4. The letter "conveniently omitted" the fact that "the Solar Panels were, in fact, backed by a warranty from another entity or division of Panasonic," thus creating the false impression that Kinect was selling the SolarCity panels without any warranty from Panasonic. *Id.*

*Kinect Solar* is inapposite here, where the question is whether the falsified information in the Report was disparaging. The false impression created by Panasonic's omission was unquestionably disparaging—it cast doubt on the quality of Kinect's solar panels. Restatement

(Second) of Torts § 629 (1977). Here, it appears that, far from casting doubt on the quality of AHBP's Product, the falsified information was intended to *overstate* its quality to conform to ANMAT requirements. Moreover, the SAC does not offer any reason to believe that the Lynd Defendants intended for ANMAT to discover that the Report contained falsified data such that its falsity would reflect negatively on AHBP or, alternatively, that they intended to secure ANMAT approval through deceit and then publicly disparage AHBP for introducing a defective product to the Argentinian market. In other words, Plaintiff does not plausibly allege that the false information in the Report was intended to cast doubt on the quality of the Product or AHBP or to be understood in a disparaging sense.[4]

Although Plaintiff reasonably believes it suffered reputational harm as a result of the discovery that the information was falsified, a business disparagement claim is not the proper vehicle for addressing harm that is purely reputational in nature. While the torts of business disparagement and defamation are "similar in many respects," "[t]he two torts differ in that defamation actions chiefly serve to protect the personal reputation of an injured party, while a business disparagement claim protects economic interests." *Forbes*, 124 S.W.3d at 170.

Because business disparagement, unlike defamation, is solely concerned with economic harm, proof of special damages is a "fundamental element of the tort." *Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 155 (Tex. 2014). "That special damages are fundamental to business disparagement makes a plaintiff's injury a useful proxy for determining

---

[4] The parties further disagree about whether the false information was published "with malice." A defendant acts with malice "only if he knew of the falsity or acted with reckless disregard concerning it, or if he acted with ill will or intended to interfere in the economic interest of the plaintiff in an unprivileged fashion." *Kinetic Concepts, Inc. v. Bluesky Med. Corp.*, No. SA-03-CA-0832-RF, 2005 WL 3068209, at *2 (W.D. Tex. Nov. 1, 2005) (quoting *Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 766 (Tex. 1987)). Regardless of the Lynd Defendant's subjective intent in submitting the false report, however, accepting the allegations in the SAC as true, the Lynd Defendants "knew of the falsity" of the information they submitted to ANMAT on Plaintiff's behalf. Accordingly, Plaintiff has sufficiently alleged the "malice" element of its business disparagement claim.

when the tort is actionable. Thus, if the gravamen of the plaintiff's claim is for special damages (e.g., an economic injury to the plaintiff's business), rather than general damages to its reputation, then the proper cause of action may be for business disparagement." *Innovative Block*, 603 S.W.3d at 418.

The special damages requirement "goes to the cause of action itself and requires that plaintiff 'establish pecuniary loss that has been realized or liquidated as in the case of specific lost sales.'" *Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 767 (Tex. 1987) (citations omitted). To prove special damages, a plaintiff must provide evidence "that the disparaging communication played a substantial part in inducing third parties not to deal with the plaintiff, resulting in a direct pecuniary loss that has been realized or liquidated, such as specific lost sales, loss of trade, or loss of other dealings." *Encompass Off. Sols., Inc. v. Ingenix, Inc.*, 775 F. Supp. 2d 938, 959 (E.D. Tex. 2011) (finding conclusory statements regarding lost profits and lost business, "void of any supporting facts, is insufficient to support a claim for business disparagement").

Plaintiff alleges that the alteration of the Report prevented AHBP from receiving approval from ANMAT, caused it reputational harm, and left it unable to sell the Product, resulting in damages. ECF No. 34 at 32. However, it is unclear from the SAC that AHBP's failure to sell the Product was a direct result of the Lynd Defendants' publication of false information to ANMAT. ECF No. 27 at 33. Indeed, it appears that AHBP was unable to sell the Product based on ANMAT's discovery of the true quality of the Product, rather than concern about Plaintiff's integrity or reputation. Even setting aside that the false information in the Report was not disparaging, the Court cannot conclude that the communication of the false information "played a substantial part in inducing third parties not to deal with the plaintiff, resulting in a direct pecuniary loss that has been realized or liquidated, such as specific lost sales, loss of trade, or loss of other dealings."

*Encompass Off. Sols., Inc.*, 775 F. Supp. 2d at 959. While the false information in the Report may indeed have caused Plaintiff to suffer reputational harm, reputational injury alone is insufficient to support a claim for business disparagement.

Because the false information contained in the Report was not disparaging and because the SAC does not establish that AHBP suffered special damages as a result of its falsity, Plaintiff has failed to state a plausible claim for business disparagement.

### F. Breach of Contract (Count 6)

In Texas, a claim for breach of contract requires "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 418 (5th Cir. 2009) (quoting *Aguiar v. Segal*, 167 S.W.3d 443, 450 (Tex. App.— Houston 2005, pet. denied)). While the Lynd Defendants do not dispute the existence or validity of the Agreement or Plaintiff's performance thereunder, they argue that Plaintiff's claim for breach of contract should be dismissed because Plaintiff fails to identify a specific provision of the Agreement that was breached. ECF No. 27 at 27 (citing *Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Ga., Inc.*, 995 F. Supp. 2d 587, 602 (N.D. Tex. 2014)).

There is some authority for the proposition that a plaintiff must identify a specific provision of the contract that was allegedly breached in order to properly plead a breach-of-contract claim. *See, e.g.*, *Williams v. Wells Fargo Bank, N.A.*, 560 F. App'x 233, 238 (5th Cir. 2014) ("It has been held that a claim for breach of a note and deed of trust must identify the specific provision in the contract that was breached."). Many of these cases pertain to mortgage foreclosures, however, and "it is not clear that the Fifth Circuit extends this holding to all claims for breach of contract." *Royalty Clearinghouse, Ltd. v. CTS Properties, Ltd.*, No. A-16-CV-1342-LY-ML, 2017 WL

5071340, at *17 (W.D. Tex. July 12, 2017). Indeed, in the primary case on which the Lynd Defendants rely, *Innova Hospital*, the Fifth Circuit reversed the district court's dismissal of breach of contract claims based on a purported failure to identify the specific terms of the agreement. 892 F.3d 719, 732 (5th Cir. 2018).

It appears that fairly generic allegations as to the nature of the breach can satisfy the pleading requirements under Rule 8(a). *See id.* at 731–32 (concluding that the plaintiffs' allegation that the defendant insurer "breached the provision of the agreement obligating it to pay the plaintiff's claims for covered products and services" was sufficient to allege a breach by the insurer); *Rapid Tox Screen LLC v. Cigna Healthcare of Tex. Inc.*, No. 3:15-CV-3632-B, 2017 WL 3658841, at *10 (N.D. Tex. Aug. 24, 2017) (rejecting the defendants' motion to dismiss where the plaintiff alleged that contracts provided for reimbursement of medical expenses incurred by defendants at "usual, customary, and reasonable rates"). "Such a recognition is consistent with the principle that 'a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations[.]'" *Innova Hosp.*, 892 F.3d at 728–29 (citing *Twombly*, 550 U.S. at 555); *see also Curtis v. Cerner Corp.*, 621 B.R. 141, 161 (S.D. Tex. 2020) ("To require such formulaic pleading would militate against the simplicity and brevity of statement which the rules contemplate and harken back to rigid writ pleading which the Federal Rule of Civil Procedure were meant to repeal." (citations and quotation marks omitted)). This understanding also comports with substantive law in Texas, which recognizes that "[a] breach of contract occurs when a party fails to perform an act that it has expressly *or impliedly* promised to perform." *Methodist Hosps. of Dallas v. Corp. Communicators, Inc.*, 806 S.W.2d 879, 882 (Tex. App.—Dallas 1991, writ denied) (emphasis added).

Here, Plaintiff alleges that it "expected Defendants to perform [under the Agreement] by delivering the bargained-for Product," that the Product "could not meet ANMAT's standards," and that it suffered money damages resulting from Defendants' breach of contract. ECF No. 25 ¶¶ 2–3, 5. Despite the Lynd Defendants' arguments to the contrary, these factual assertions, taken as true and construed in the light most favorable to Plaintiff, sufficiently allege that Defendants breached the Agreement by failing to deliver a conforming product. It is possible that the sanitizer was defective in multiple respects, given ANMAT's refusal to approve the Product and the EPA's Stop Sale, Use or Removal Order. Plaintiff need not specify the precise manner in which the sanitizer deviated from the "bargained-for Product" at this stage of the litigation.

Citing an unauthenticated copy of the Agreement attached to their motion to dismiss, *see* ECF No. 27-1, the Lynd Defendants assert that none of Bio Supplies' purported conduct runs afoul of the Agreement: "The Agreement itself does not set forth any requirement that the Product comply with ANMAT. The Agreement does not state that Bio Supplies was responsible for conducting testing on the Product. The Agreement does not allege that Bio Supplies was responsible for any representations regarding the Product." ECF No. 27 at 37 (citations omitted). They also point to a warranty disclaimer in the Agreement, which provides:

> **Warranty Disclaimer**. BIO SUPPLIES HEREBY EXPRESSLY DISCLAIMS ANY AND ALL WARRANTIES OF ANY KIND OR NATURE CONCERNING THE PRODUCTS, WHETHER EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR AGAINST INFRINGEMENT.

ECF No. 27 at 37 (citing ECF No. 27-1). "In this respect," the Lynd Defendants argue, "the contractual obligations in the Agreement are not aligned with any of AHBP's allegations regarding Bio Supplies' purported wrongdoings, e.g. making misrepresentations about the Product's

compliance with ANMAT and providing a Report to AHBP after the formation of the Agreement." *Id.*

Plaintiff did not attach a copy of the Agreement to the SAC. Generally, if a motion to dismiss refers to matters outside the pleading it is more properly considered as a motion for summary judgment. FED. R. CIV. P. 12(d). However, if a defendant attaches to its motion to dismiss under 12(b)(6) a contract referenced in the plaintiff's complaint and which is central to the plaintiff's claims, the court may consider the contract part of the pleadings when ruling on the motion to dismiss. *In re Katrinia Canal Breaches, Litig.*, 495 F.3d 191, 205 (5th Cir. 2007); *see also Causey v. Sewell Cadillac–Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004). The Fifth Circuit has explained that, under these circumstances, it considers the attached contract to be part of the pleadings because "[i]n so attaching [the contract], the defendant merely assists the plaintiff in establishing the basis of the suit, and the court in making the elementary determination of whether a claim has been stated." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 499 (5th Cir. 2000). The contract attached to the defendant's motion to dismiss can only assist the plaintiff where there is no dispute that the attached contract is in fact the same contract that is referenced in the complaint and central to the plaintiff's claims. *M-I, LLC v. Enventives, LLC*, No. 4:17-CV-3275, 2018 WL 2376503, at *3 (S.D. Tex. Apr. 26, 2018).

Here, the Court declines to consider the exhibit submitted by the Lynd Defendants. Plaintiff explicitly notes that the version of the Agreement attached to the motion to dismiss "is not authenticated by any person with knowledge." ECF No. 34 at 35 (citing *Raybourne & Dean Consulting, Ltd. v. Metrica, Inc.*, No. CV SA-14-CA-918-OLG, 2015 WL 12866335, at *8 (W.D.

Tex. Aug. 11, 2015) (declining to consider documents where "none of the exhibits are authenticated").[5]

For the foregoing reasons, the Court concludes that Plaintiff has sufficiently alleged a claim for breach of contract.

### G.    Economic Loss Doctrine

The Lynd Defendants argue that Plaintiff's claims sounding in tort are barred by the economic loss doctrine. ECF No. 27 at 33–36; ECF No. 35 at 29–31. Under Texas's economic loss rule, no duty in tort exists when plaintiffs have suffered only economic losses. *Mem'l Hermann Healthcare Sys. Inc. v. Eurocopter Deutschland, GMBH*, 524 F.3d 676, 678 (5th Cir. 2008). While the economic loss rule generally precludes tort claims resulting from failure to perform under a contract when the harm consists only of the economic loss of the contractual expectancy, "it does not bar all tort claims arising out of a contractual setting." *Chapman Custom Homes, Inc. v. Dall. Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014). The rule is not generally applicable, and its application depends on an analysis of its rationales in a particular situation. *McCaig v. Wells Fargo Bank, N.A.*, 788 F.3d 463, 474 (5th Cir. 2015). When a party states a tort claim arising from (1) an alleged breach of an independent duty (*i.e.*, one not arising from the contract), and (2) the harm suffered is not merely the economic loss of a contractual benefit, the economic loss rule does not apply. *Chapman*, 445 S.W.3d at 718. Thus, what matters in determining whether the economic

---

[5] Even if the Court were to consider the exhibit, Plaintiff has alleged that it was fraudulently induced to enter into the Agreement. To the extent that the disclaimer in the Agreement was procured by fraud, it would not relieve the Lynd Defendants from liability. *Regus Mgmt. Grp., LLC v. IBM Corp.*, No. 7:19-cv-00417, 2008 WL 1836360, *4 (N.D. Tex. Apr. 24, 2008) ("The law does not support such a finding [that the limitation of liability provision is enforceable even if was procured by fraud] . . . Nothing in Texas law requires the Court to enforce particular provisions in a contract that has been fraudulently procured") (collecting cases); *see also Reynolds Metals Co. v. Westinghouse Elec. Corp.*, 758 F.2d 1073, 1078 (5th Cir. 1985) ("Such a failure would constitute a total failure of performance, a breach of contract for which the warranty disclaimer would not protect Westinghouse, or at least the jury was entitled to so conclude on this record").

loss rule applies are the source of the duty allegedly breached and the nature of the injury. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contrs.*, 960 S.W.2d 41, 45 (Tex. 1998).

The Texas Supreme Court has applied the economic loss rule in cases involving defective products or failure to perform a contract. *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 418 (Tex. 2011). In such cases, losses are more appropriately addressed through common-law breach of contract claims than through tort claims. *Id.* Courts have not extended the economic loss rule to fraudulent inducement claims, however, noting that "it is well established that the legal duty not to fraudulently procure a contract is separate and independent from the duties established by the contract itself." *Formosa*, 960 S.W.2d at 46; *see also Curtis v. Cerner Corp.*, 621 B.R. 141, 167 (S.D. Tex. 2020) ("Defendants may not rely on the economic loss rule to dismiss noncontractual claims where the contract was procured by fraud."); *Sharyland*, 354 S.W.3d at 418 ("[A] party [cannot] avoid tort liability to the world simply by entering into a contract with one party. The economic loss rule does not swallow all claims between contractual and commercial strangers."). "Accordingly, tort damages are recoverable for a fraudulent inducement claim irrespective of whether the fraudulent representations are later subsumed in a contract or whether the plaintiff only suffers an economic loss related to the subject matter of the contract." *Formosa*, 960 S.W.2d at 47.

Plaintiff correctly points out that, with respect to its claim for negligent misrepresentation, the Lynd Defendants' falsification of the Report violated duties that arose independently of the parties' contractual obligations. ECF No. 34 at 37–38. A duty to disclose arises when one party knows the other is relying on a concealed fact and does not have an opportunity to discover the truth, or when one party voluntarily discloses some but not all material facts, thereby creating a false impression. *Union Pac. Res. Grp., Inc. v. Rhone-Poulenc, Inc.*, 247 F.3d 574, 586 (5th Cir.

2001) (citing *World Help v. Leisure Lifestyles, Inc.*, 977 S.W.2d 662, 670 (Tex. App.—Fort Worth 1998, pet. denied)).

The Lynd Defendants' argument that any duty to provide accurate laboratory results arises solely pursuant to the Agreement is unavailing. It is undisputed that the Agreement does not contain any requirement that Bio Supplies conduct testing on the Product or make any representations concerning the Product to ANMAT. *See* ECF No. 34 at 37; ECF No. 27 at 37. Nonetheless, Bio Supplies and ViaClean took it upon themselves to arrange for the testing and to make the representations in the Report to Plaintiff and to ANMAT. The Lynd Defendants represented to Plaintiff that the Product complied with ANMAT's standards and then provided the falsified Report to Plaintiff and ANMAT, knowing that Plaintiff relied on their so-called "confidential" laboratory tests for its ANMAT application. In doing so, the Lynd Defendants assumed an affirmative duty to make a full and truthful disclosure. Thus, even absent the Agreement, Plaintiff would have a claim against the Lynd Defendants for negligent misrepresentation. *Id.*

The Lynd Defendants contend that Plaintiff alleges only economic damages in the SAC, noting that AHBP "seeks recovery for the same economic loss purportedly caused by Bio Supplies' breach of contract" in each of its causes of action for fraud, negligent misrepresentation, and business disparagement—$93,426,300. ECF No. 37 at 33 (citing ECF No. 25 ¶¶ 56, 63, 77). While this specific figure does appear under each of the causes of action in the SAC, the Lynd Defendants' reading is flawed in at least two respects. First, it overlooks that the SAC consistently alleges that "Plaintiff has been damaged in an amount to be determined at trial, *but in no event less than* $90,426,300." *See* ECF No. 25 ¶¶ 49, 56, 63, 71, 77, 93 (emphasis added). Second, the SAC

clearly alleges that Plaintiff has suffered reputational harm as a result of Defendants' misrepresentations. *See id.* ¶¶ 39, 71.

"Texas law treats damage to reputation as a non-economic loss." *Finishmaster, Inc. v. Richard's Paint & Body Shop, LLC*, 2012 WL 2376218, at \*7–8 (W.D. Tex. June 22, 2012) (collecting Texas cases). As reputational damages are not purely economic, they are not barred by the economic loss rule. *Id.* at \*3; *see also Nazareth Int'l, Inc. v. J.C. Penney Corp.*, No. Civ.A. 304CV1265M, 2005 WL 1704793, at \*8 (N.D. Tex. July 19, 2005) ("It is possible for Plaintiff to prove that these alleged injuries [of harm to Plaintiff's business resulting from the alleged negligent misrepresentations] are independent from the subject matter of the contract").

Accordingly, the Court concludes that Plaintiff's surviving tort claims for fraudulent inducement, common-law fraud, and negligent misrepresentation are not barred by the economic loss doctrine.

### H.    Contractual Limitation on Liability

The Lynd Defendants argue that Plaintiff's recovery should be limited to $100,000.00, per the contractual limitation on liability set forth in the Agreement. ECF No. 27 at 38–39. They urge the Court to dismiss Plaintiff's claims for damages in excess of the contractual limit because "AHBP does not allege that the Agreement is unenforceable or contrary to public policy." *Id.*

The Court disagrees with the Lynd Defendants' characterization of AHBP's claims. Indeed, Plaintiff has explicitly alleged that it was fraudulently induced to enter into the Agreement by the Lynd Defendants' misrepresentations as to the Product's quality and ability to meet ANMAT's standards. *See* ECF No. 25 ¶ 24 ("In reliance on Bio Supplies' representations concerning the Product and its quality standards, and with no way to verify, Plaintiff entered into

[the Agreement], dated October 2020."). Indeed, these factual allegations are at the heart of Plaintiff's claims sounding in fraud.

It is well established that "Texas courts may not enforce a contractual limitation of liability as a defense to an intentional tort such as fraud." *Helms v. Sw. Bell Tel. Co.*, 794 F.2d 188, 193 (5th Cir. 1983); *see also Budner v. Wellness Int'l Network, Ltd.*, No. 3:06-CV-0329-K, 2007 WL 806642, *8 (N.D. Tex. Mar. 15, 2007) ("Defendants cannot prospectively limit their liability for intentional torts such as those pleaded by Plaintiffs. Texas courts have held that a party cannot prospectively insulate itself contractually from liability for intentional torts."); *Simmonds Equip., LLC v. GGR Int'l, Inc.*, 126 F. Supp. 3d 855, 867 (S.D. Tex. 2015) (citing *Solis v. Evins*, 951 S.W.2d 44, 50 (Tex. App.—Corpus Christi 1997, no writ) (finding that it would be "contrary to public policy" for a party to "prospectively contractually exculpate itself with respect to intentional torts"). Accordingly, the Court concludes that the Lynd Defendants may not limit their liability pursuant to the limitation of liability clause in the Agreement at this stage of the proceedings.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss the Petition (ECF No. 27) is **GRANTED IN PART** with respect to Plaintiff's claims for business disparagement and **DENIED** in all other respects.

It is so **ORDERED**.

**SIGNED** this 9th day of January, 2023.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE